State *v.* Edwards

## STATE OF CONNECTICUT *v.* LAMONT EDWARDS
### (SC 19899)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of, among other crimes, murder, conspiracy to commit murder,
assault in the first degree, and conspiracy to commit assault in the first
degree in connection with an incident in which two men opened gunfire
on a car and killed a fifteen year old victim and seriously injured two
other victims, the defendant appealed to this court, claiming, inter alia,
that the trial court improperly had admitted certain out-of-court state-
ments by two witnesses, T and M, identifying the defendant as the
shooter and improperly instructed the jury on third-party culpability by
omitting the names of certain potential third-party culprits. On the day
of the shooting, the defendant was attending a social gathering at which
numerous other individuals were present, including F, T, C, M and H.
The defendant had driven F and an unidentified man wearing a do-rag
or a hat to the social gathering in a car that the defendant had been
renting for approximately three weeks, but F was separated from the
defendant shortly after arriving. At some point thereafter, two armed
men approached a black car that was stopped in the vicinity and began
shooting into the vehicle. The shooters then ran toward the defendant's
parked car, entered it, and fled the scene, at which point a nearby driver
recorded its license plate number. The following day, the defendant
spoke to T and C and told them that he had "done it" but that the driver
of the black car had been the intended target, not the fifteen year old
victim. Subsequently, M came forward and stated to the police that he
had seen the defendant by the driver's side of the black car during the
shooting and that the defendant was one of the shooters. The defendant
thereafter was arrested while attempting to flee Connecticut for Califor-
nia. At the defendant's trial, the state questioned M on direct examination
regarding his statements to the police, but M maintained that he could
not recall making those statements or the events surrounding the shoot-
ing. The trial court admitted into evidence a portion of a transcript of
testimony that M previously had given to a federal grand jury in which
M stated that he observed the shooter on the driver's side of the black
car wearing clothes similar to clothing the defendant had been wearing
earlier on the day of the shooting and that he also observed the shooters
run to the defendant's car. During redirect examination, the trial court
twice overruled defense counsel's hearsay objection and permitted the
state to question M regarding his statements to the police. The state
subsequently questioned W, a detective with the New Haven Police
Department, about what M had told W about the shooting, but defense
counsel objected to that line of questioning on hearsay grounds, and

State *v.* Edwards

the trial court sustained the objection. The state then objected when
defense counsel asked W, on cross-examination, about his interviews
of two eyewitnesses to the shooting who had been unable to identify
the defendant as the shooter. The trial court overruled the state's objec-
tion but cautioned that the door would be open for the state to question
W, during its redirect examination, regarding who had identified the
shooter. During redirect examination, the state then asked W how many
people had identified the defendant as the shooter, and defense counsel
objected, not on the basis of hearsay but because the testimony would
be cumulative. The court overruled counsel's objection, and W testified
that M, H, and T, who did not testify at the defendant's trial, had identified
the defendant as one of the shooters. Thereafter, the defendant submit-
ted a request to charge the jury with a third-party culpability instruction
that named six individuals as potential culprits, including F and J, who
was a friend of the defendant, whose fingerprints and DNA were found
in the defendant's car, and who had been arrested on unrelated charges
while in possession of a mask similar to one identified by witnesses as
being worn by one of the shooters. At a charge conference, the trial
court granted the defendant's request for a third-party culpability instruc-
tion but determined that there was sufficient evidence to require the
charge only as to J. Defense counsel countered that there was suffic-
ient evidence to require a third-party instruction as to F, and the court
responded that it would either give a general instruction without nam-
ing anyone or one that named only J. Following closing arguments, the
court held a second charge conference, at which it reiterated that it
would either name only J or refer generally to a third party, and, after
the defendant repeated his preference for naming both F and J, the
court gave an instruction that omitted the names of the potential third-
party culprits. On appeal from the judgment of conviction, *held*:

1. The defendant's claim that the trial court improperly admitted hearsay
   evidence by allowing W to testify that M and T had identified the defen-
   dant as one of the shooters was unpreserved and, accordingly, was
   unreviewable: although defense counsel objected on hearsay grounds
   to W's testimony during the state's direct examination regarding M's
   out-of-court statements to the police, including M's identification of the
   defendant as one of the shooters, counsel's sole stated basis for objecting
   to W's testimony, during redirect examination, regarding M's and T's
   statements identifying the defendant as one of the shooters was that it
   was cumulative, and, accordingly, counsel failed to apprise the trial
   court that he continued to object to the admission of the challenged
   out-of-court statements on the basis of hearsay.

2. The defendant could not prevail on his claim that the admission, through
   W's testimony, of T's out-of-court statement identifying the defendant
   as the shooter violated his right to confrontation because, even if the
   admission of that statement violated the defendant's right to confronta-
   tion, any such error was harmless: the state satisfied its burden of

State *v.* Edwards

proving that any error in admitting T's statement was harmless beyond a reasonable doubt, as that statement, which was cumulative of other evidence and which the state did not rely on or refer to during closing argument, was inconsequential in light of the overwhelming, independent evidence of the defendant's guilt, including testimony from numerous witnesses placing the defendant at the crime scene and demonstrating that he drove there in the car in which the shooters later fled, testimony from multiple witnesses that the defendant was one of the shooters, testimony from two witnesses that the defendant admitted that he was involved in the shooting, evidence establishing that the defendant was motivated by revenge against the driver of the black car, who previously had flirted with the defendant's girlfriend, K, and whose friends had been involved in an altercation with K's son several months before the shooting, and evidence of the defendant's consciousness of guilt, including evidence that the defendant returned the rental car the morning after the shooting, K's testimony that the defendant had denied hearing about the shooting the night it occurred but later devised and implemented a plan to flee to California in K's car, and evidence that the defendant was apprehended with $1000 in cash and a California address programmed in a navigation device in K's car.

3. The trial court did not abuse its discretion in declining to include the names of J and F in its third-party culpability instruction to the jury: although the trial court did not provide the jury with the exact instruction that the defendant sought due to that court's determination that there was sufficient evident to support a third-party culpability instruction as to J only, the court included the substance of the requested instruction, namely, that evidence had been presented that a third party may have committed the crimes for which the defendant was charged, which was consistent with the court's indication at two charge conferences that it would name only J in the instruction or refer generally to third parties, and with the defendant's stated preference that he did not want to omit F from the instruction; moreover, there was little evidence supporting a direction connection between F and the offenses with which the defendant was charged, and, even if this court had concluded that the trial court was required to identify J by name in the instruction, it was not reasonably possible that the jury was misled by the omission of J's name, as the court's instruction required the jury to consider the evidence presented implicating any third party, which necessarily included J, the defendant presented evidence implicating J, and defense counsel referred to J's possible culpability during closing argument, and, accordingly, the court's instruction provided the jury with sufficient guidance to allow it to consider all of the third-party culpability evidence and to determine the defendant's guilt in light of such evidence.

Argued September 19, 2019—officially released February 25, 2020

State *v.* Edwards

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of assault in the first degree and conspiracy to commit assault in the first degree, and one count each of the crimes of murder, conspiracy to commit murder, carrying a pistol without a permit and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven, where the charges of assault in the first degree, conspiracy to commit assault in the first degree, murder, conspiracy to commit murder and carrying a pistol without a permit were tried to the jury before *B. Fischer, J.*; verdict of guilty of two counts of assault in the first degree and one count each of conspiracy to commit assault in the first degree, murder, conspiracy to commit murder and carrying a pistol without a permit; thereafter, the charge of criminal possession of a firearm was tried to the court; finding of guilty; judgment in accordance with the jury's verdict and court's finding of guilt, from which the defendant appealed to this court. *Affirmed.*

*Vishal K. Garg*, for the appellant (defendant).

*Nancy L. Walker*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Seth R. Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Lamont Edwards, appeals[1] from the trial court's judgment of conviction of various crimes in connection with his involvement in a shooting on a crowded New Haven street in which a fifteen year old boy died and two individuals were seriously

_____

[1] The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3), which authorizes a direct appeal to this court "in any criminal action involving a conviction for a . . . class A felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

State *v.* Edwards

injured.[2] The defendant claims that the trial court improperly admitted the out-of-court statements of two witnesses identifying him as the shooter in violation of the hearsay rule and that the admission of one of those two statements, made by a witness who did not testify at trial, also violated his constitutional right to confront the witnesses against him. The defendant also claims that the trial court's third-party culpability instruction improperly omitted the names of the potential third-party culprits. As to the admission of the two out-of-court statements, the state responds that this court should decline to review the defendant's challenge to their admission because the defendant failed to preserve his evidentiary challenge and the record is inadequate to review his constitutional challenge. In the alternative, the state contends that the defendant (1) opened the door to that evidence, and (2) even if the admission was improper, this court should nonetheless affirm the trial court's judgment on the basis that any evidentiary error was not harmful and any constitutional error was harmless beyond a reasonable doubt. In response to the defendant's challenge to the trial court's third-party culpability instruction, the state argues that the instruction was sufficient because the law does not require that the court include the name or names of the alleged third-party culprits. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of August 8, 2014, fifteen year old Jacob Craggett was with his brother Joshua Craggett

[2] The defendant was convicted of murder in violation of General Statutes (Rev. to 2013) § 53a-54a, conspiracy to commit murder in violation of General Statutes (Rev. to 2013) § 53a-54a and General Statutes § 53a-48 (a), two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), conspiracy to commit assault in the first degree in violation of §§ 53a-59 (a) (5) and 53a-48, carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217.

State *v.* Edwards

and their cousins, Timothy Jones (TJ) and Jerray Jackson, in front of their grandmother's home at 21 Vernon Street in New Haven. They had arrived there sometime after 5:30 p.m. Between fifteen and twenty people were outside on Vernon Street that evening, smoking marijuana, talking and listening to music. Others present that evening included the defendant, who goes by the street name "Duce," Christopher Hudson, Tora Moss, Richard Foster, Matthew Mitchell, Sonjay Gallimore and Jessica Carter.

A number of those present on Vernon Street, including Carter, Foster, Moss and the defendant, had been at a dice game at Chapel Park earlier that day. After leaving Chapel Park, Foster encountered mechanical problems with his car and called the defendant, who came to pick him up. When Foster entered the defendant's car, there was a third person there, a stranger who wore a do-rag or a hat. The three men drove to Vernon Street, and, when they arrived, the defendant parked his rental car on Davenport Avenue, near the intersection of Vernon and Davenport. At first, Foster, the defendant and the stranger were walking down Vernon Street together, greeting everyone there. At some point, however, the defendant said he had to go "holler" at someone, and he and Foster became separated. Foster recalled that the defendant walked toward the rear of the parking lot of 23 Vernon Street—that was the last that Foster saw of the defendant that evening. He could not be certain whether the stranger remained with the defendant. About five or ten minutes later, as Foster was commiserating with Moss about their respective monetary losses at the dice game, he heard the sound of gunshots.

Shortly before the shooting started—a bit before 9 p.m.—TJ, Joshua, Jacob and Jerray decided to leave Vernon Street. TJ offered them a ride in his car. The side and rear windows of TJ's Volkswagen Jetta were darkly tinted, and the front passenger door was broken

State *v.* Edwards

and could be opened only from the outside. TJ drove down Vernon Street toward Davenport Avenue. Joshua sat in the front passenger seat, Jacob was behind him in the backseat and Jerray was in the backseat on the driver's side behind TJ.

TJ came to the stop sign at the corner of Vernon and Davenport and waited while traffic passed. Within moments, TJ and his passengers heard gunshots and the sound of bullets hitting the car. Joshua and Jacob were each shot. Jacob did not survive his injuries. Mitchell was standing near 23 Vernon Street at the time of the shooting, which was not far from the corner of Vernon and Davenport. As the gunshots were ringing out, Mitchell saw a man running down the street, shouting: "What is [Duce] doing? Josh is in the car." From his location, Mitchell could see that there were two shooters, and that at least one of them was standing on the driver's side of the Jetta. He could see that one of the shooters—he could not recall where this person was standing in relation to the Jetta—wore clothing similar to what the defendant had been wearing when Mitchell saw him at the dice game at Chapel Park earlier that day. Mitchell later told the police that he had been able to identify the defendant as one of the shooters.

Hudson, Jerray's brother, was standing in front of 23 Vernon Street when the Jetta came to the intersection of Vernon and Davenport. When the Jetta came to a stop, Hudson saw two black males running toward the car. They stood on both sides of the car, then started shooting into the front of the passenger compartment. Hudson was unable to identify the shooter on the passenger side of the Jetta, but he identified the defendant as the shooter on the driver's side. After Jacob was shot, Hudson saw the shooters run toward the defendant's car, which was parked in front of the home of Moss' mother at 122 Davenport Avenue. The defendant had to run past the front of the Jetta to get to his car.

State *v.* Edwards

The shooters then entered the defendant's car and drove down Davenport Avenue in the direction of the hospital. Joshua attempted to walk down Vernon Street, asking people for help, but he soon passed out.

When she heard the sound of gunshots coming from behind her, Kristen Constantopoulos was in her car on Davenport Avenue, stopped at a traffic light at the intersection of Howard Avenue and Davenport Avenue, headed downtown. In her rearview mirror, Constantopoulos saw someone run to a silver car that was parked on Davenport Avenue at the corner of Vernon Street and jump into the passenger side. The car then started traveling down Davenport Avenue toward her, speeding so fast that she thought it would collide with her car. As the traffic light turned green, the car swerved around her and continued to the next traffic light. As the car passed her, Constantopoulos made note of the New York license plate number and recorded the plate number in her phone. When Detective Michael Wuchek of the New Haven Police Department ran the plate number provided by Constantopoulos, he discovered that it belonged to a gray Kia Optima that was registered to Avis, a rental car company. The defendant had rented the Kia on July 14, 2014, and returned the car to Avis the day after the shooting, on August 9, 2014.[3]

The night of the shooting, Keisha Hodges, the defendant's girlfriend, was sleeping when her children woke her and told her that the defendant was at the door. Although Hodges could not recall specifically the time of the defendant's visit, she did recall that he said that he had just come from Vernon Street, where he had been drinking with friends, including Moss. He did not mention that there had been a shooting on Vernon Street

[3] Several witnesses testified that the defendant had been driving a rental car in the weeks preceding the shooting. Descriptions of the car varied— some reported that it was silver, others said it was bronze, and most witnesses recalled that the car was a Hyundai.

State *v.* Edwards

that night. While the defendant was at her home, however, Hodges saw coverage of the shooting on the news and asked him what had happened. He told her that he did not know.

The day after the shooting, Moss contacted Carter, Jerray's sister, and asked her to meet him that evening in the parking lot outside her home on Vernon Street. When they met, they spoke together about the shooting for a few minutes, after which Moss offered to make a phone call to the defendant. He spoke to the defendant briefly, then placed the phone on speaker and had Carter come close so she could hear the conversation. She heard the defendant say, "[d]amn, Jess." She asked, "what the hell happened out there?" The defendant responded that he had been there the night before and he had "done it" but that he had not known "the kids were in the car." He expressed remorse and explained that the shooting "wasn't meant for the kids; it was meant for TJ." He observed, however, that "what's done is done," and, he added, he could not "take it back."

Sometime during the weekend following the shooting, the defendant told Hodges that he wanted to go to California to stay with her brother until he "cleared his name." On Monday, the defendant asked Hodges to marry him, and they were married that day at city hall in New Haven. The following day they left for California, with plans to stop first in New York. The defendant was apprehended when the state police stopped Hodges' car somewhere between Stamford and Greenwich. The defendant initially gave his brother's name to the police but, when confronted, said, "[a]h, you got me." The defendant was arrested and Hodges' car was towed to the New Haven police garage.

The state charged the defendant in an eight count information with murder, conspiracy to commit murder, two counts of assault in the first degree, two counts of conspiracy to commit assault in the first degree,

State *v.* Edwards

carrying a pistol without a permit, and criminal possession of a firearm. See footnote 2 of this opinion. The charge for criminal possession of a firearm was tried to the court; the remaining counts were tried to the jury. The defendant was found not guilty of one count of conspiracy to commit assault. He was convicted of the remaining seven counts. The trial court subsequently sentenced the defendant to a total effective sentence of eighty-five years.[4] This appeal followed.

I

ADMISSION OF OUT-OF-COURT IDENTIFICATIONS

The defendant challenges the admission of the out-of-court statements of two witnesses, Moss and Mitchell, identifying the defendant as one of the shooters. The defendant claims that both statements were admitted in violation of the hearsay rule. The defendant additionally contends that the admission of the statement of Moss, who did not testify at the defendant's trial, violated his constitutional right to confront the witnesses against him. We address each of these claims in turn.

A

Hearsay

The defendant first claims that the admission of both statements violated the rule against hearsay. The state contends that, because defense counsel did not object to the admission of the out-of-court identifications on the basis of hearsay at the time that Wuchek testified to the identifications and, instead, objected on the basis that the testimony was cumulative, the defendant

---

[4] The defendant was sentenced as follows: fifty years on count one for murder; fifteen years on count two for assault in the first degree, to run consecutive to count one; fifteen years on count three for assault in the first degree, to run consecutive to counts one and two; twenty years on count four for conspiracy to commit murder, to run concurrently with count one; fifteen years on count six for conspiracy to commit assault in the first degree, to run concurrently with counts one and four; five years on count seven for carrying a pistol without a permit, to run consecutive to counts one, two and three; and five years on count eight for criminal possession of a firearm, to run concurrently with counts one, four, six and seven.

State *v.* Edwards

failed to preserve this claim. The defendant responds
that, because defense counsel previously objected on
the basis of hearsay to testimony regarding Mitchell's
out-of-court identification of the defendant during both
Mitchell's and Wuchek's testimony, counsel was not
required to reiterate that objection in order to preserve
it.[5] In the event that we were to conclude that the claim
is unpreserved, the defendant asserts that it was plain
error.[6] We conclude that the defendant failed to pre-
serve this claim.

The following additional facts and procedure are rele-
vant to this claim. We begin with a general overview.
The state met with limited success when it attempted
to elicit testimony from Mitchell that he previously had
identified the defendant as the shooter.[7] The state first

---

[5] In his initial brief, the defendant relies solely on his hearsay objection
to Mitchell's testimony. Only in his reply brief does the defendant claim
that he adequately apprised the trial court of the basis of his objection to
Wuchek's testimony regarding the out-of-court statements during Wuchek's
direct examination.

[6] As to the defendant's claim that the admission of the out-of-court state-
ments is reversible under the plain error doctrine, we conclude that the
defendant has failed to demonstrate that the alleged error "is indeed plain
in the sense that it is patent [or] readily [discernible] on the face of a factually
adequate record, [and] also . . . obvious in the sense of not debatable."
(Internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531,
552, 212 A.3d 208 (2019). As we repeatedly have emphasized, "[an appellant]
cannot prevail . . . unless he demonstrates that the claimed error is both
so clear and so harmful that a failure to reverse the judgment would result
in manifest injustice." (Emphasis omitted; internal quotation marks omitted.)
*State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017). The defendant
has not satisfied this stringent standard.

[7] During the state's direct examination, Mitchell initially suggested that
his memory of the events surrounding the shooting may have been affected
by the fact that he had been prescribed the medication Seroquel sometime
around 2012 or 2013. When the state followed up, however, and asked him
whether his memory was "fuzzy," Mitchell responded: "I had some problems
so went to a doctor and therapist that, you know, probably around . . .
probably 2012, [2013], and first was prescribed Seroquel." The following
colloquy ensued:

"[The Prosecutor]: That wasn't the question, sir. The question is, your
memory about [August 8, 2014] is fuzzy?

"[The Witness]: I wouldn't say that particular day but my memory about
days are fuzzy."

Subsequently, on cross-examination, Mitchell denied taking Seroquel on
the night of the shooting, as the following colloquy demonstrates:

State *v.* Edwards

questioned Mitchell regarding his prior testimony to a
federal grand jury. When Mitchell testified that he was
unable to recall that testimony, the state questioned
him regarding statements he had made to the police,
but Mitchell said that he did not recall making those
statements. The state subsequently questioned Wuchek
regarding Mitchell's statements to the police. Wuchek's
testimony—that, in Mitchell's statement to the police,
Mitchell claimed that he saw the defendant standing on
the driver's side of the Jetta during the shooting—is the
testimony that the defendant challenges as improper
hearsay.

The details of Mitchell's and Wuchek's testimony, as
well as the arguments of counsel and rulings of the trial
court, provide helpful context for our consideration of
whether the defendant properly apprised the trial court
of the basis of defense counsel's objection. Mitchell
acknowledged in his testimony that he was at Vernon
Street on the night of the shooting and that, prior to
the shooting, he was at the dice game at Chapel Park.
He denied, however, that he saw the defendant at Chapel
Park or at Vernon Street, and, when the state pressed,
he stated he did not recall whether he had seen the defen-
dant. On the basis of Mitchell's repeated testimony that
he could not recall the events of the night of the shooting,
the state sought permission to treat him as a hostile wit-
ness, which the court denied. The state next unsuccess-
fully attempted to use the transcript of Mitchell's prior
testimony before a federal grand jury to refresh his recol-

_____

"[Defense Counsel]: Okay. Okay. And on August 8, 2014, being diagnosed
with bipolar, and having it, whether prescribed or not, had you taken it
that day?

"[The Witness]: I don't remember.

"[Defense Counsel]: Okay. Is it possible you may have taken it that day?

"[The Witness]: No.

"[Defense Counsel]: It's possible or it's not?

"[The Witness]: No."

No evidence or expert testimony was offered regarding the effects of
Seroquel.

State *v.* Edwards

lection, asking him a series of questions about his testimony and establishing that, as to the bulk of that testimony, Mitchell could not recall it.[8] The trial court denied the state's request during direct examination to admit Mitchell's testimony contained in the prior grand jury transcript pursuant to this court's decision in *State* v. *Whelan*, 200 Conn. 743, 753–54, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The trial court indicated that it would consider it after cross-examination and subsequently granted the state's motion to admit some portions of the transcript of Mitchell's grand jury testimony as a full exhibit.

During cross-examination, Mitchell testified that he never stated in his testimony to the grand jury that he saw the defendant shooting at the Jetta. He also testified during cross-examination that he told neither the grand jury nor the police what either of the shooters was wearing. On redirect examination, the state questioned Mitchell regarding statements he had made to the police shortly after the shooting. The court overruled defense counsel's hearsay objection on the basis that "this is what [Mitchell's] telling the police." The state then went through a detailed set of questions regarding Mitchell's statements to the police, asking with respect to each individual statement whether Mitchell recalled making it. Each time, Mitchell responded that he did not recall making the statement. Most significant, over defense counsel's objection on the basis of hearsay, the state was permitted to ask Mitchell if he recalled telling the police that he saw the defendant on the driver's side of the Jetta

---

[8] Specifically, the state elicited testimony that Mitchell could not recall telling the grand jury that he saw two individuals running up to a vehicle before the gunshots were fired, he was standing at a fence and facing Vernon Street when the shooting occurred, he had seen the shooters earlier that day, he observed the position of the shooters relative to the targeted vehicle, the shooters had two different types of guns, someone was running down the street shouting, "what is Duce doing? Josh is in the car," and that the clothing that the defendant wore earlier that day was similar to the clothing worn by one of the shooters.

during the shooting. This question was permitted after the witness had been asked and testified on cross-examination that he had never told the grand jury that he saw the defendant shooting at the Jetta. In overruling defense counsel's objection, the court explained that defense counsel would have the opportunity to address Mitchell's identification during recross-examination. Mitchell responded to the question by testifying, however, that he did not recall making that statement to the police.

When the state subsequently questioned Wuchek, he testified that, two days after the shooting, he met with Mitchell, who had come forward as a "concerned citizen." The state then asked Wuchek: "What did [Mitchell] tell you in regard to this investigation?" Defense counsel objected to the "entire line" of questioning on the basis of hearsay. The state responded that it did not seek to introduce the testimony for its truth but to impeach Mitchell because he had denied making all of the statements to the police. Outside the presence of the jury, the state proffered the line of questions it intended to ask Wuchek regarding numerous statements that Mitchell had made to him on August 10, 2014, including Mitchell's statement that he "recalled seeing [the defendant] on the driver's side of the Jetta during the shooting." Defense counsel reiterated his objection on the basis of hearsay. The court sustained defense counsel's objection and observed that the statements Mitchell had made to the police covered "the same topics that were reviewed in the grand jury testimony for the most part."

During cross-examination, defense counsel questioned Wuchek regarding his interviews of two persons who, although present at Vernon Street on the night of the shooting, were unable to identify the shooters. Specifically, during direct examination, Wuchek testified that he had interviewed both Deja Antrum and T'Naisha Brown, neither of whom testified at trial. On cross-examination, defense counsel elicited testimony, over the state's objection on the basis of hearsay, that Antrum

State *v.* Edwards

and Brown had been unable to identify the shooters. The state argued that, if the court allowed defense counsel to elicit these hearsay statements, it would seek to introduce the out-of-court statements of "other witnesses [who] did make [identifications]." When defense counsel claimed the question for purposes of exploring the scope of the state's investigation, the court stated: "So, then, on redirect, he could go into the [witnesses] who allegedly did [identify] other people. Is that . . . ." Defense counsel reiterated his position that, because Wuchek had testified during direct examination that he had interviewed the two witnesses, his questions regarding what those witnesses said during the interviews went to the scope of Wuchek's investigation. The court allowed the line of questioning but cautioned counsel that, if he pursued it, the court might allow the state to inquire about witnesses who were able to identify the defendant as a shooter.

Defense counsel asked Wuchek whether Antrum and Brown had identified the defendant as one of the shooters. Wuchek answered that neither of them had. Wuchek then acknowledged that the defendant regularly frequented the Vernon Street area and, therefore, that he was known to people in that neighborhood.

The following day, on redirect examination, the state asked Wuchek: "How many people identified the defendant as the shooter?" Defense counsel objected, but not on the basis of hearsay. Instead, defense counsel claimed that the testimony would be cumulative, stating: "There's testimony with respect to identification of this defendant already." The court overruled that objection, and Wuchek testified that Hudson, Moss and Mitchell had identified the defendant as one of the shooters. Moss did not testify at trial.[9]

_____

[9] On the second day of trial, December 9, 2016, the state informed the court that it would delay the testimony of Moss, who had been scheduled to testify that morning, until the afternoon because his attorney had a scheduling conflict. The state subsequently informed the court that it had determined not to call Moss until December 12, 2016.

State *v.* Edwards

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013). "We have explained that these requirements are not simply formalities." *State* v. *Miranda*, 327 Conn. 451, 465, 174 A.3d 770 (2018). "[A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . For this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party." (Internal quotation marks omitted.) *Council* v. *Commissioner of Correction*, 286 Conn. 477, 498, 944 A.2d 340 (2008). "Thus, because the essence of preservation is fair notice to the trial court, the determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Internal quotation marks omitted.) *State* v. *Miranda*, supra, 465; see also Practice Book § 5-5 ("[w]henever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had").

Our review of the trial transcripts persuades us that defense counsel did not adequately apprise the trial

State *v.* Edwards

court that he continued to object on the basis of hearsay to Wuchek's testimony regarding the statements of Moss and Mitchell. Although defense counsel had objected to that testimony on that basis when the state tried to elicit it during its direct examination of Wuchek, defense counsel's sole stated ground for the objection, on redirect examination the following day, was that the testimony would be cumulative. The trial court cannot reasonably be expected to anticipate that defense counsel intended —in addition to the presently stated ground—to reiterate his previously stated ground for objecting to the identifications. A trial is a fluid process, and parties adapt their strategies in light of procedural developments. Trial courts are not required to inquire whether a party's failure to raise a prior ground for objection is an inadvertent omission as opposed to an evolving strategy. In the present case, for example, it would have been possible for defense counsel, after successfully introducing the out-of-court statements of Antrum and Brown over the state's hearsay objection and after the court's caution that his questioning may open the door to similar questions by the state on redirect, to view his hearsay objection as no longer viable. If defense counsel arrived at that conclusion, a reasonable strategy would be to attempt to circumvent that issue by relying on an entirely different basis for objecting to Wuchek's testimony regarding witnesses who did identify the defendant. It is incumbent on the parties, not the court, to properly articulate the present basis for an objection. Defense counsel's hearsay objection was not preserved.

B

Confrontation Clause

Pursuant to this court's decision in *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), the defendant seeks review of his claim that the admission of the out-of-court identification of the defendant by Moss, who did not tes-

State *v.* Edwards

tify at the defendant's trial, violated his constitutional right to confront the witnesses against him.[10] The state responds, first, that the record is inadequate to review the defendant's claim and, second, that there was no violation of the defendant's right to confrontation because defense counsel opened the door to the testimony regarding Moss' statement. Third, in the event that this court concludes that the testimony violated the defendant's right to confrontation, the state argues that any error was harmless beyond a reasonable doubt. We agree with the state's third contention. Assuming without deciding that the admission of Moss' out-of-court identification of the defendant violated his right to confrontation, we conclude that any error was harmless beyond a reasonable doubt.

We first address the state's contention that the defendant's claim is unreviewable.[11] Under *Golding*, the defendant can prevail "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject

_____

[10] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." This right applies to the states through the due process clause of the fourteenth amendment to the federal constitution. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); see also Conn. Const., art. I, § 8.

[11] The state does not rely on its claim that the defendant "opened the door" to argue that the defendant's *Golding* claim is unreviewable. See, e.g., *Independent Party of CT—State Central* v. *Merrill*, 330 Conn. 681, 723–24, 200 A.3d 1118 (2019) (observing that "*Golding* review is not available when the claimed constitutional error has been induced by the party claiming it"). Instead, the state argues that defense counsel's cross-examination of Wuchek opened the door to Wuchek's testimony that Moss identified the defendant as one of the shooters, necessitating the conclusion that the defendant's right to confrontation was not violated. The state therefore relies on its "opening the door" theory to argue that the defendant cannot prevail on the merits of the confrontation claim.

State *v.* Edwards

to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.'' (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239 –40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). The state contends that, because the record does not disclose whether Moss' statement was admitted for its truth or simply to show the extent of the police investigation, the record is inadequate for review. We disagree. It is undisputed that no limiting instruction was given to the jury as to this testimony. In the absence of any such limiting instruction, the jury was entitled to consider the evidence for its substance. See, e.g., *State* v. *Adams*, 327 Conn. 297, 309–10, 173 A.3d 943 (2017) (''in the absence of a limiting instruction, the finder of fact is entitled to draw any inferences from the evidence that it reasonably would support'' [internal quotation marks omitted]). Accordingly, the record is adequate for review.

We conclude that, even if the admission of the testimony regarding Moss' out-of-court identification of the defendant violated his constitutional right to confront the witnesses against him, any error was harmless beyond a reasonable doubt. Accordingly, the defendant's claim fails on the fourth prong of *Golding*.

This court has long recognized that ''a violation of the defendant's right to confront witnesses is subject to harmless error analysis . . . . In undertaking this analysis, the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . In addition, [w]hen an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 420, 64 A.3d 91 (2013).

State *v.* Edwards

"This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State* v. *Artis*, 314 Conn. 131, 159, 101 A.3d 915 (2014). Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony. See *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008).

We must determine whether the state has demonstrated beyond a reasonable doubt that the introduction of Moss' out-of-court identification of the defendant did not contribute to the defendant's conviction. We first consider the strength of the state's case. The evidence of guilt was compelling. The state's case was comprised of the following components: witnesses (other than Moss) who placed the defendant at the scene; witnesses who identified the defendant as the shooter; two witnesses to whom the defendant admitted his guilt; testimony and evidence establishing that the shooters fled from the scene in the defendant's rental car, which was parked at the corner of Vernon Street and Davenport Avenue at the time of the shooting; testimony establishing that the defendant's motive for the shooting was vengeance against TJ; and consciousness of guilt evidence.

State *v.* Edwards

Multiple witnesses—Mitchell, in his statement to the police, and Foster, Hodges, Gallimore, and Hudson —placed the defendant at Vernon Street at the time of the shooting. The testimony of Foster, Gallimore and Hodges, taken together, established that the defendant went from Chapel Park to Vernon Street, then to Hodges' home after the shooting. Foster testified that he and the defendant both were at the dice game at Chapel Park earlier that day and that the defendant gave him a ride to Vernon Street after Foster had mechanical problems with his car.[12] Foster said that the defendant parked his car in the vicinity of the home of Moss' mother at 122 Davenport Avenue, and that he, the defendant and a person unknown to Foster, who had been in the car with them, walked down Vernon Street. Foster also testified that the shooting started within five to ten minutes after he lost sight of the defendant and the stranger. Although she did not see who was shooting at the Jetta, Gallimore recalled that, immediately after the shots were fired, she saw the defendant at the corner of Vernon Street and Davenport Avenue, heading down Davenport in the direction of the hospital. Hodges testified that, when she saw the defendant later that evening, he told her he had just come from Vernon Street.

The state also presented evidence that both Hudson and Mitchell identified the defendant as one of the shooters. Both witnesses knew the defendant prior to the shooting. Hudson testified that he saw the defendant standing on the driver's side of the Jetta and shooting at it. He then saw the defendant run in front of the Jetta toward his rental car, which was parked in front of the home of Moss' mother. Hudson saw the defendant get into the driver's side of the vehicle; the other shooter got into the passenger side, and they drove down Davenport Avenue in the direction of the hospital.

[12] Mitchell, in his grand jury testimony, and Carter confirmed that the defendant had been at the Chapel Park dice game prior to the shooting.

State *v.* Edwards

Although Hudson had given two previous statements in which he claimed he could not see who the shooter was, both Foster and Mitchell corroborated his testimony that he saw the defendant shooting at the Jetta. Specifically, Foster testified that, during the shooting, Hudson was running down Vernon Street, shouting, "is that Duce . . . why are they wilding?" "Why did Duce do that?" In his testimony to the federal grand jury, a portion of which was admitted as a full exhibit, Mitchell confirmed that, during the shooting, a person was running down Vernon Street shouting, "what is Duce doing? Josh is in the car." During trial, Hudson explained that the reason he did not initially identify the defendant as the shooter was because he feared for the safety of his family.

As we discussed in part I A of this opinion, Wuchek testified that, two days after the shooting, Mitchell came forward as a concerned citizen and identified the defendant as one of the shooters. Additionally, Mitchell's grand jury testimony corroborated some of the details of Hudson's testimony: that the defendant was on the driver's side of the Jetta and that the shooters ran to the defendant's car, then drove off. Specifically, in his grand jury testimony, Mitchell recalled that the shooter who was on the driver's side of the Jetta wore clothing similar to what the defendant had been wearing at the dice game. He also testified to the grand jury that, after the shooters stopped firing, they ran down Davenport Avenue toward the home of Moss' mother.

The state also presented evidence that, on two separate occasions, the defendant admitted to the shooting. Carter testified that, on the day after the shooting, the defendant told her that he did it, and that the intended victim was TJ, not "the kids." The state also presented the testimony of a jailhouse informant, Chamar Vick, who stated that he knew the defendant and that, at some point after the shooting, he and the defendant were in

State *v.* Edwards

court at the same time. Although he did not expressly admit to Vick that he was one of the shooters, the defendant told Vick: "Wrong time, wrong place. It was meant for somebody else." The defendant told Vick that the bullet had not been meant for Jacob, and that the intended target was a person named Noone, an associate of TJ. The defendant also told Vick that the reason for the shooting had to do with Hodges and her son, Tyeshon Johnson, known as Mook.[13]

The state also presented evidence demonstrating that the defendant drove his rental car, a Kia Optima, to Vernon Street on the night of the shooting, parked the Kia in front of 122 Davenport Avenue, near the corner of Vernon and Davenport, and that, when the shooters stopped firing, they ran to the defendant's Kia, got in and drove down Davenport in the direction of the hospital.[14] Witness testimony and evidence established that, in the weeks leading up to the shooting, the defendant had been driving a gray Kia Optima with New York plates that he rented from Avis. Foster's testimony established that the defendant drove the Kia from Chapel Park to Vernon Street that evening and parked the car in front of 122 Davenport Avenue. Mitchell, Hudson, Gallimore and Constantopoulos provided testimony that established that the shooters ran to the Kia, got in and drove down Davenport. Through the testimony of Constantopoulos, the state proved that the fleeing vehicle had a

_____

[13] During cross-examination of Vick, the defendant highlighted Vick's status as an incarcerated jailhouse informant and suggested that Vick was testifying in the hope of getting a deal. The state elicited testimony from Vick that, on the morning of Vick's testimony, the defendant told Vick to say nothing. The defendant told Vick that he knew where Vick's family lived and correctly gave Vick his family's address.

[14] In light of the overwhelming evidence presented by the state that the defendant parked his rental car, a gray Kia Optima with New York plates, in front of 122 Davenport Avenue, and that the car was used by the shooters to flee the scene, we consider it immaterial that many witnesses were unable to recall the make, model and color of the vehicle. See footnote 3 of this opinion.

New York license plate number of GRB3413. Carter testified that the defendant's rental car had New York plates. The state produced a rental agreement between the defendant and Avis, which demonstrated that the defendant rented from Avis a gray Kia Optima, with a New York license plate number of GRB3413. The rental agreement indicates that the defendant picked up the Kia on July 14, 2014, and that he returned the car to Avis the morning after the shooting, at 10:21 a.m. on August 9, 2014. Hodges testified that she never saw anyone other than the defendant drive the Kia.

The state also presented evidence of the defendant's possible motive for the shooting. The state's theory was that TJ was the target of the shooting, and the defendant sought revenge against TJ for two reasons: TJ's friends had been involved in an altercation with Hodges' son, Mook, several months before the shooting, and TJ had "hit on" Hodges. Carter testified that the defendant told her that TJ was the intended target of the shooting. Vick testified that the defendant told him the reason for the shooting was because Mook "wasn't getting the job done." TJ and Hodges testified regarding the altercation between TJ's friends and Mook. TJ also acknowledged that he knew Hodges and, when asked if he had tried to "mess around" with her, responded: "She's a pretty decent looking woman, of course I tried, why wouldn't I?"

The state presented evidence of consciousness of guilt as well, most notably the defendant's attempt several days after the shooting to leave the state. Hodges' testimony established that, within days after the shooting, the defendant formulated and implemented a plan to travel to California and to stay with Hodges' brother, who lived there. Hodges testified that, at some point during the weekend following the shooting, the defendant asked her to contact her brother in San Bernardino, California, to ask if they could visit him there for a few days.

The defendant told Hodges that he wanted to go to California, "[u]ntil he cleared his name." She testified that they planned to leave Tuesday morning to drive to California, and that, before they left, she entered her brother's address in the GPS system that she placed in her car along with a notepad on which she had written her brother's address and contact information. In support of Hodges' testimony, the state produced as evidence items that were seized from the passenger compartment of Hodges' car when the police stopped Hodges and the defendant somewhere between Stamford and Greenwich. Specifically, the state produced the GPS and notepad. The notepad indicates the address of Hodges' brother, along with his telephone number. The GPS screen shows a search entered into the device for that address. The state also produced as evidence items seized from the trunk of the car—the bags and clothing that Hodges and the defendant had packed for the trip. Wuchek testified that, when they apprehended the defendant, the police also recovered more than $1000 in cash from him.

The defendant's behavior at the time that he was apprehended provided further evidence of consciousness of guilt. David Acosta, an officer with the New Haven Police Department, who was working with the United States Marshal Service Violent Fugitive Task Force at the time of these events, testified that, when the state police stopped Hodges' car close to the New York border, the defendant initially gave the name of his brother, James Edwards. As a result, Acosta had to approach the vehicle and identify the defendant. When Acosta asked the defendant if he was "done playing games now," the defendant responded by putting his hands up and saying, "[a]h, you got me."

As additional evidence of the defendant's consciousness of guilt, the state elicited testimony from Hodges establishing that, when he arrived at her home on the night of the shooting, the defendant was less than forth-

State *v.* Edwards

coming about what had happened while he was at Vernon Street that evening. She testified that he told her that he had just come from drinking with friends at Vernon Street. He said nothing, however, about the shooting that had taken place on Vernon Street that evening. When Hodges saw the news about the shooting on television and asked him what happened, the defendant stated that he did not know. Other evidence of consciousness of guilt included evidence that the defendant returned the Kia Optima to Avis on the morning following the shooting and Vick's testimony that the defendant told him to say nothing.

We consider it significant that, although the state alluded in its closing argument to the fact that Moss did not testify, it did not rely on or even refer to Moss' out-of-court identification of the defendant. Instead, the state focused on the evidence outlined in this opinion, namely, the identifications by Hudson and Mitchell, Foster's testimony placing the defendant and his car at the scene, Carter's and Vick's testimony that he admitted his guilt, the attempted flight to California, and Constantopoulos' testimony regarding the defendant's license plate. It is also significant that Moss' out-of-court identification was not an important part of the state's case against the defendant. Instead, the evidence was cumulative, and Moss' identification was corroborated by the independent identifications by Hudson and Mitchell. See *State* v. *Smith*, supra, 289 Conn. 628. In light of the fact that the state did not rely on Moss' identification, and, considering Moss' identification of the defendant in the context of the overwhelming evidence presented by the state, particularly the two independent identifications of the defendant as one of the shooters, we conclude that, even if the admission of Moss' out-of-court identification violated the defendant's right to confrontation, any error was harmless beyond a reasonable doubt.

State *v.* Edwards

## II

## THIRD-PARTY CULPABILITY CHARGE

We next address the defendant's claim that the trial court's third-party culpability instruction improperly omitted the names of Roy Jones III and Foster, and instead stated: ''There has been evidence that *a third party*, not the defendant, committed the crimes for which the defendant is charged.'' (Emphasis added.) The defendant contends that the charge was improper because it differed in substance from the charge that he had requested and was inadequately adapted to the issues before the jury. The state responds that the trial court's failure to give a charge in exact conformance to the defendant's request did not render the charge improper because the charge as given by the court was sufficient. We agree with the state.

The following additional procedural facts are relevant to our resolution of this claim. In the court's first charge conference, it began by confirming that both the state and defense counsel had reviewed the court's proposed charge to the jury. The court then ran through the proposed charges, asking the parties whether they had any objections to them. In his request to charge, the defendant had listed six individuals with respect to whom he believed there was sufficient evidence to require a third-party culpability instruction. The court informed the parties that, pursuant to its review of the record, it agreed that there was sufficient evidence to require the charge, but only as to Jones; the court suggested that it did not believe that there was sufficient evidence to justify the charge as to the remaining five individuals.[15] When defense counsel argued

[15] The state objected to the third-party culpability charge on the ground that, because its theory of the case was that there were two shooters, the fact that there may be sufficient evidence to implicate Jones as one of the shooters did not entitle the defendant to a third-party culpability charge. The state explained that, even if the jury were to find that Jones was one of the shooters, it could find that the defendant was his coconspirator or

State *v.* Edwards

that there was also sufficient evidence to require a third-party culpability instruction as to Foster, the court offered to give the instruction without mentioning any names. Defense counsel responded that he would prefer to have the court name the potential third-party culprits. The court reiterated its ruling that it would name only Jones in the instruction. The court then added: "Listen, you obviously have the right . . . in your closing argument to go through what you say with all these other people. There's no limitations on that."

In defense counsel's closing argument, he referenced Jones once, in connection with the other individuals he had identified as potential third-party culprits: "Then there's different possibilities of who could be involved in this. We heard the name Roy Jones, James Edwards whose fingerprints are in the car, James Asti Butler fingerprints, Tyshaun Johnson who has a motive, Calvin Moss, Michael Singletary, Tavares Johnson, and the detective's testimony was it—I ruled everyone out. He testified he couldn't rule people out." Defense counsel referred to Foster a number of times during closing argument, suggesting that the jury should question whether to credit his testimony. He pointed out that Foster had been granted immunity in connection with his testimony and emphasized that Foster's white t-shirt and do-rag were consistent with a description of one of the shooters.

When the court held a second charge conference following closing arguments, the court initially stated that it would name both Jones and Foster in its third-party culpability instruction. After the parties reviewed the revised proposed charge during a break, the state took exception to the third-party culpability charge and reminded the court that it had offered the defense a

accessory. Having heard argument on the issue, the trial court agreed with the defendant that—as to Jones—a third-party culpability instruction was justified because the evidence was sufficient to establish a direct connection between Jones and the crime.

State *v.* Edwards

choice between a charge that named only Jones, or one that simply referred to "third parties." Defense counsel recalled the first charge conference differently, and stated his belief that the court had earlier determined that it would name both Foster and Jones. The court agreed with the state that its earlier ruling was that it would either name only Jones in the charge or refer generally to "third parties," and inquired of defense counsel which he would prefer. After defense counsel indicated his preference for retaining the charge naming both Foster and Jones, the court stated that it would modify the charge to refer generally to "third parties," without naming any individual third parties.

The trial court charged the jury as follows: "I next want to talk to you about third-party culpability. There has been evidence that a third party, not the defendant, committed the crimes for which the defendant is charged. This evidence is not intended to prove the guilt of the third party but is part of the total evidence for you to consider. The burden remains on the state to prove each and every element of the offense beyond a reasonable doubt. It is up to you, and to you alone, to determine whether any of this evidence, if believed, tends to directly connect a third party to the crimes with which the defendant is charged. If, after a full and fair consideration and comparison of all the evidence you have left in your minds a reasonable doubt indicating that an alleged third or alleged third parties may be responsible for the crimes, the defendant is charged— is charged with committing, then it would be your duty to render a verdict of not guilty as to the [defendant]."

"We begin with the well established standard of review governing the defendant's challenge[s] to the trial court's jury instruction. Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a

State *v.* Edwards

request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is reasonably possible for [improprieties] of constitutional dimension or reasonably probable for nonconstitutional [improprieties] that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 808–809, 91 A.3d 384 (2014).[16]

The defendant's claim that he was entitled to have the court name Foster and Jones in the third-party culpability charge is squarely governed by the principle that, "[i]f a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal." (Internal quotation marks omitted.) Id., 809. The defendant requested a charge instructing the jury that evidence had been presented that a third party may have committed the crime with which

---

[16] Citing to *State* v. *Inglis*, 151 Conn. App. 283, 296–97, 94 A.3d 1204, cert. denied, 314 Conn. 920, 100 A.3d 851 (2014), cert. denied, 575 U.S. 918, 135 S. Ct. 1559, 191 L. Ed. 2d 647 (2015), the state claims that the "reasonably probable" standard for nonconstitutional improprieties applies when a defendant challenges the omission of a third-party culpability charge or claims that the charge given was improper. Notwithstanding the Appellate Court's decision in *Inglis*, this court's decision in *Baltas* controls. In *Baltas*, we applied the constitutional standard to review the defendant's challenge to the trial court's denial of his request for a third-party culpability instruction. See *State* v. *Baltas*, supra, 311 Conn. 808.

State *v.* Edwards

the defendant was charged. The trial court gave that charge in substance but did not give the charge exactly as requested by the defendant due to the trial court's finding that, of the six persons as to whom the defendant requested the third-party culpability charge, there was sufficient evidence only as to Jones to support giving the charge. For that reason, the court offered the defendant a choice between two alternatives: the charge would name Jones—and only Jones—individually, or the charge would refer to "parties" and refrain from naming any specific individuals. Because defense counsel indicated that he did not want to omit Foster from consideration as a potential third-party culprit, the court did not refer to any individuals by name. That approach was consistent with the court's statement to defense counsel during the first charge conference, prior to closing argument, that he was free to pursue his third-party culpability defense as to any and all of six individuals the defendant had named in his original request to charge.

The court's ruling also was consistent with its earlier determination that there was sufficient evidence only as to Jones to support giving the charge. That determination, which is subject to review for abuse of discretion; see, e.g., *State* v. *Jackson*, 304 Conn. 383, 424, 40 A.3d 290 (2012); precluded the trial court from granting defense counsel's request to name Foster in the third-party culpability charge. It is well established that "[a] request to charge [that] is relevant to the issues of [a] case and [that] is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, *the trial court has a duty not to submit it to the jury. . . .* Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Emphasis added; internal quotation marks omitted.) *State* v. *Baltas*, supra, 311 Conn. 810.

State *v.* Edwards

Our review of the record persuades us that the trial court's determination that the evidence supported naming Jones, but not Foster, in the third-party culpability instruction was not an abuse of discretion. In the context of a third-party culpability charge, the trial court's determination of relevance turns on the distinction between a "direct connection" between the third party and the crime as opposed to a "bare suspicion . . . ." *State* v. *Arroyo*, 284 Conn. 597, 610, 935 A.2d 975 (2007); see id. ("if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury"). The trial court, in determining that the evidence was insufficient to support naming Foster in the third-party culpability charge, implicitly found that, although the evidence was sufficient to establish a direct connection between Jones and the crime, it did not rise to the same level with respect to Foster.

The record supports the trial court's determination. Evidence presented at trial linking Jones to the crime was sufficient to rise above a "bare suspicion" and included Wuchek's testimony that, during the course of his investigation of the shooting, he identified Jones, who was friends with Foster, Moss and the defendant, as a suspect. Wuchek also testified that Jones' fingerprints and DNA were found in the defendant's Kia Optima. When Wuchek followed up on the alibi that Jones provided, he was unable to verify it. Finally, some witnesses at the scene of the shooting described one of the shooters as having worn a mask.[17] When Jones was subsequently taken into custody in a separate mat-

_____

[17] As the defendant emphasizes on appeal, witnesses provided diverging accounts of the clothing worn by the perpetrators. Those descriptions included a white tank top, black cargo shorts and a do-rag or mask, khaki shorts and white t-shirts.

State *v.* Edwards

ter, the police seized from his vehicle a mask that was similar to the one described by witnesses to the shooting.

As to Foster, there was little evidence supporting a direct connection between him and the crime. He admitted that he wore a white t-shirt and a do-rag on the night of the shooting, which was consistent with a witness' description of what one of the shooters was wearing. He also admitted that he arrived at Vernon Street with the defendant in the defendant's car. The defendant also points to inconsistencies between Foster's account of his whereabouts during the shooting, which placed him in front of 23 Vernon Street and away from the intersection with Davenport Avenue, and the accounts of others, who did not recall seeing Foster immediately prior to or after the shooting. On this record, we conclude that it was not an abuse of discretion for the court to decline to name Foster in the third-party culpability charge.

Finally, even if we were to conclude that the trial court was required to identify Jones by name in the charge, we conclude that there is no reasonable possibility that the jury was misled by the omission of Jones' name.[18] The defendant had presented evidence implicating Jones, and defense counsel referred to Jones' possi-

---

[18] We reject the defendant's assertion that, in this court's decision in *State* v. *Arroyo*, supra, 284 Conn. 597, we implicitly recognized "that a third-party culpability charge naming a particular third-party culprit had some substance not contained within the standard jury instructions concerning identity, the presumption of innocence, and the burden of proof." We first observe that, in contrast to the present case, the trial court in *Arroyo* gave *no* third-party culpability instruction, and the defendant's requested instruction named only one third-party culprit, the victim's father. *State* v. *Arroyo*, supra, 607 and n.8. More important, the issue presented in *Arroyo* was not whether the trial court was required to deliver the exact charge requested by the defendant but whether the trial court improperly declined to deliver a third-party culpability charge. Id., 607.

We also reject the defendant's suggestion that we have established a distinction between what the defendant denotes "an *Arroyo* instruction" from "a *Berger* instruction." In *State* v. *Berger*, 249 Conn. 218, 234, 733 A.2d

State *v.* Edwards

ble culpability during closing argument.[19] By directing the jury to consider evidence that had been presented implicating a "third party," the court's charge required the jury to consider evidence implicating *any* third party, including both Jones *and* Foster.[20] The court's instruction, therefore, provided the jury with sufficient guidance to allow it to consider all of the third-party culpability evidence and to determine the defendant's guilt in light of such evidence.

The judgment is affirmed.

In this opinion the other justices concurred.

_____

156 (1999), this court addressed the question of whether "the trial court improperly denied [the defendant's] request for a specific instruction on the relationship between [third-party] culpability evidence and the concept of proof beyond a reasonable doubt." The issue in the present case, whether a trial court must name potential third-party culprits in its charge to the jury, was not presented in *Berger* or in *Arroyo*, and we have not drawn a distinction between different types of third-party culpability charges based on those two decisions.

[19] The defendant's contention that he suffered harm because defense counsel, believing that the trial court would name Jones in the third-party culpability instruction, failed to provide a more detailed discussion in closing argument of the evidence implicating Jones, is belied by the court's clear notice to counsel that he was free to argue third-party culpability as to any individual and make the arguments he deemed appropriate.

[20] The court's charge arguably provided the defendant with an advantage, particularly when the undisputed evidence was that there were two shooters at the scene. That is, notwithstanding the trial court's determination that there was sufficient evidence to establish a direct connection between Jones and the crime but not Foster, the court's use of the term "a third party" left the jury free to consider the evidence as to any and all third parties claimed or identified by the defendant in determining whether to return a verdict of not guilty.